United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK O. CROPSEY,<br>    Plaintiff,<br>v.<br>COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 18-cv-02838-DMR<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 19, 20 |

Plaintiff Mark O. Cropsey moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Plaintiff not disabled and therefore denied his application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. The Commissioner cross-moves to affirm. For the reasons stated below, the court grants Cropsey's motion in part and denies it in part and remands this matter for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

Cropsey filed an application for Social Security Disability Insurance (SSDI) benefits on July 15, 2015, alleging disability beginning on April 8, 2014. Administrative Record ("A.R.") 184-190. His application was initially denied on September 25, 2015 and again on reconsideration on April 7, 2016. A.R. 119-123, 125-130. Cropsey then filed a request for a hearing before an Administrative Law Judge ("ALJ"). A.R. 131-132. ALJ David LaBarre held a hearing on February 21, 2017. A.R. 50-83.

After the hearing, the ALJ issued a decision finding Cropsey not disabled. A.R. 30-45. The ALJ determined that Cropsey has the following severe impairments: major neurocognitive disorder due to multiple etiologists (traumatic brain injury and substance abuse) with behavioral disturbance (DSM-IV: dementia due to multiple etiologies); anxiety disorder (stimulant induced-

nasal decongestant); and affective disorder (major depressive disorder and bipolar). A.R. 35-36. The ALJ found that Cropsey retains the following residual functional capacity ("RFC"):

> [F]ull range of work at all exertional levels but with the following nonexertional limitations: assume an individual of the claimant's age, education and work experience who is able to perform work at all exertional levels. The individual is able to understand, carry out, and remember simple, routine and repetitive tasks, involving only simple work-related decisions with the ability to adapt to routine work place changes. The individual is able to tolerate a work environment where the supervisor delivers work instructions verbally or by demonstration. The individual could tolerate occasional interaction with the general public. The individual can work in proximity to others, but with only brief, incidental interaction with others and no tandem job tasks requiring cooperation with other workers to complete the task. The individual could work where supervisors occasionally interact with the worker throughout the day.

A.R. 38.

Relying on the opinion of a vocational expert ("VE") who testified that an individual with such an RFC could perform Cropsey's past relevant work as a dishwasher, as well as other jobs existing in the economy, including hand packager, linen room attendance, and janitor, the ALJ concluded that Cropsey is not disabled. A.R. 43-44.

The Appeals Council denied Cropsey's request for review on April 26, 2018. A.R. 1-7. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Plaintiff then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

2

economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3. At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4. At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5. At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

### III. FACTUAL BACKGROUND

#### A. Cropsey's Testimony

Cropsey testified that at the time of the hearing, he was living in a shelter. A.R. 53. He explained that he has a driver's license but does not drive because he cannot afford a car. His mother drove him to the hearing. A.R. 56-57.

3

Cropsey testified that he last worked in April 2014 at Life House, working with adults with developmental disabilities as a Residential Technician. He held that position for seven years. A.R. 58. Cropsey testified that his basic responsibilities were to make meals according to a set menu, prepare the residents for bed, and "d[o] activities with them." A.R. 58-60. He also helped residents with dressing, grooming, and getting into and out of bed. A.R. 60. He worked eight hours per day. A.R. 58.

Prior to his position at Life House, Cropsey worked for 13 years for Cedars of Marin, which serves adults with developmental disabilities. A.R. 60-61. In his position as Instructor, Cropsey "wrote objectives" for the residents' individual service plans, taught residents kitchen and cleaning skills, and did art and music therapy with the residents. A.R. 61, 70. He left the position at Life House because "the responsibilities of the job became more than [he] could handle." Cropsey testified that his work responsibilities triggered panic attacks. A.R. 62.

Cropsey testified that he is unable to work because he "fatigue[s] easily" and has "very bad anxiety." A.R. 62. He testified that he is unable to do any job, because he believes that "[t]he responsibilities [of any job] will overwhelm [him]" and he will start having embarrassing panic attacks. A.R. 67.

He takes Lorazepam, Risperdal, and Paxil for his panic and anxiety, and testified that the medications decrease his panic and anxiety and helps him "cope better," but that the medication is "not very helpful as in enabling [him] to work." A.R. 62. Cropsey sees a therapist, Gardner Fair, once per week. A.R. 67. He testified that he has several panic attacks per week, lasting "a number of hours." During his panic attacks, he feels "very tensed up" and apprehensive, and experiences constricted breathing. A.R. 63. He also "move[s] around a lot" and does not "stay in his seat." A.R. 63. Activities like riding the bus can trigger panic attacks. He also has anxiety around food; he explained "when I first started having the panic attacks I was afraid I was going to choke." A.R. 64. Cropsey also testified that "I think to myself I'm not contributing anything just through cosmic welfare why should I . . . eat." A.R. 64. Cropsey experiences claustrophobia; in particular, he is "scared to death" to use elevators because he is afraid they will get stuck. A.R. 64-65.

4

Cropsey testified that he has problems concentrating. He also has problems maintaining conversation, which causes him anxiety. A.R. 65. He is able to do his "daily chores" but has difficulty maintaining his personal hygiene because "[t]he thought of taking a shower triggers a panic attack." A.R. 65-66.

Cropsey is able to go to appointments with his mother's assistance; she keeps track of his appointments and drives him. A.R. 66. His anxiety increases if his daily routine deviates or if he has "an unusual number of responsibilities in a given week." A.R. 66-67.

### B. Relevant Medical Evidence

#### 1. State Agency Medical Consultants

State agency medical consultant J. Patrick Peterson, Ph.D., reviewed the records on September 21, 2015. A.R. 93-97. Dr. Peterson opined that Cropsey can carry out simple and detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and make simple work-related decisions. A.R. 94. He concluded that while Cropsey is moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, he "remains capable of completing simple & complex tasks in a timely manner." A.R. 94. Dr. Peterson further opined that Cropsey is moderately limited in the ability to interact appropriately with the general public, but "[r]emains capable of interacting appropriately & effectively w/ others on demand." A.R. 95.

On April 6, 2016, K. Econome, M.D., reviewed and affirmed Dr. Peterson's assessment. A.R. 108-112.

#### 2. Examining Physicians

##### a. Svetlana Medvinsky, Ph.D. and Jeffrey Kahn, Ph.D.

On July 31, 2013, Kaiser's Svetlana Medvinsky, Ph.D. and Jeffrey Kahn, Ph.D. completed a Confidential Psychological Assessment of Cropsey. A.R. 511-522. The report states that Cropsey's psychiatrist, Dr. Lester Debbold, referred him for psychological testing after he

5

experienced an onset of panic attacks upon discontinuing his use of nasal decongestants. Dr. Debbold referred Cropsey for testing "to obtain diagnostic clarification, for information pertaining to intellectual functioning, and for personality assessment." A.R. 511. Drs. Medvinsky and Kahn performed a chart review, clinical interview, and administered testing. A.R. 511. They noted that Cropsey was "cooperative and forthcoming" during the testing and arrived at all sessions on time. He was able to complete all assessments and was oriented to time and place, with a euthymic affect. His memory appeared intact and he had good judgment during the sessions. A.R. 513.

Drs. Medvinsky and Kahn assessed a full scale IQ of 87, in the low average range. A.R. 514. Psychological testing "suggested that [Cropsey] experienced symptoms of depression, may have some impairment with reality testing, had underlying resentments, lacked an effective coping strategy, and did not have many relationships with others." A.R. 520. The examiners concluded that with respect to cognitive functioning, Cropsey "appeared to have difficulty accomplishing certain tasks in the allotted amount of time and had difficulties with perceptual reasoning skills." Discrepancies between his perceptual reasoning index and verbal comprehension index suggested "that [Cropsey] may have a learning disorder." A.R. 520.

Drs. Medvinsky and Kahn diagnosed Cropsey with generalized anxiety disorder; major depression, recurrent, moderate; alcohol and cannabis dependence in sustained full remission; nasal decongestant dependence in early partial remission; and learning disorder NOS. A.R. 521. They provided several recommendations for Cropsey, including attending group therapy and working with a psychiatrist "to receive medication to help manage his symptoms of depression, anxiety, and panic attacks." They further recommended "[i]ncrease time limits to complete tasks as [Cropsey] appears to have a slower processing speed." A.R. 521.

### b. Les P. Kalman, M.D., Psy.D.

Les P. Kalman, M.D., Psy.D., examined Cropsey on September 13, 2014. A.R. 684-688. Dr. Kalman interviewed Cropsey, reviewed unspecified records, and performed a mental status examination.

Cropsey looked older than his stated age. He was casually dressed and unkempt. Dr. Kalman remarked that he "looked sickly, emaciated." A.R. 684. Cropsey's chief complaint was

"issues with anxiety [his] whole life." He described his anxiety and a panic attack he experienced in 2013, but noted that he had not experienced panic attacks since then. A.R. 684. He further stated that he had had depression since sixth grade, "with social withdrawal, isolation, hopeless feelings, melancholy." A.R. 684-685.

Cropsey was cooperative, with good eye contact. His speech was at times loud, with a stutter. He was alert and oriented to person, place, date, and situation. His intelligence was average. His abstractions were intact, his judgment was fair, and his insight into his mental illness was fair. A.R. 685-686. His mood was anxious and depressed, with a restricted affect. His form of thought was logical and goal directed, and he reported no auditory or visual hallucinations. A.R. 686. He presented with mild dysphoric mood and a history of anxiety. A.R. 686.

Cropsey reported doing his own shopping, cooking, and housekeeping. He is able to manage his own transportation, care for his personal hygiene, and pay his own bills. He gets along with family and has no friends. He reported taking Paxil, Seroquel, and Loratadine. A.R. 686.

Based on his examination, Dr. Kalman opined that Cropsey has decreased ability to interact with supervisors and coworkers, deal with the public, and maintain attention, concentration, and memory. He is able to understand, remember, and carry out simple one- and two-step job instructions. He is also able to withstand the stress and pressures of daily work activities. A.R. 687. According to Dr. Kalman, Cropsey's condition was not expected to improve significantly within the next 12 months. A.R. 687.

     **c. Rachyll Dempsey, Psy.D.**

Rachyll Dempsey, Psy.D., evaluated Cropsey on July 15, 2015. A.R. 604-613. Dr. Dempsey performed a clinical interview; reviewed a statement from Cropsey's mother, Sharon Cropsey, and two weeks of records from the Sausal Creek Outpatient Stabilization Clinic; and administered several tests. *See* A.R. 604-605. She also interviewed Sharon Cropsey.

Dr. Dempsey observed that Cropsey appeared to be a good historian. His history was significant for a major traumatic brain injury at 18 months of age resulting in the need for skull surgery. A.R. 611. While he reported problems throughout school, Cropsey graduated from high

7

school on time and earned a bachelor's degree in psychology. He was married from 1996 to 2000 and has a daughter with whom he has little contact. Cropsey's only source of support is his mother. A.R. 605. Dr. Dempsey observed that Cropsey was "unshaven, with long dirty fingernails and a mild stale cigarette odor. He appeared much older than his stated chronological age, and was of average height and underweight." A.R. 608.

Cropsey's speech was "notable for a stutter and stylized pauses in his speech." His gait was smooth and eye contact was good. His mood was good and he demonstrated a fair range of affect, with a linear thought process. He was alert and oriented to person, place, and day, although he reported the date to be June 15, 2015, rather than July 15, 2015. He gave good effort with testing. A.R. 609.

Dr. Dempsey described Cropsey's substance abuse history, which she wrote was "characterized by alcohol, marijuana, hallucinogen, and nasal decongestant abuse." Cropsey reported that after a 1992 conviction for Driving Under the Influence he stopped using alcohol and started attending Alcoholics Anonymous. He started using marijuana daily at age 17 and currently uses it every day. He abused nasal decongestant spray from 1996 through 2013. A.R. 608.

Cropsey was administered an intelligence test, and displayed "extreme strengths and weaknesses which suggest[ed] that his functioning cannot be summed up with one score." He scored in the average range for verbal comprehension and working memory, in the low average range for processing speed, and in the extremely low range for perceptual reasoning. A.R. 609. He was slow to complete visual tasks, suggesting that he may struggle under time pressure. The discrepancy in his scores suggested lifelong deficits in perceptual reasoning and non-verbal abilities. A.R. 609. He scored in the high average range for language, average range for immediate and delayed verbal memory, extremely low range for delayed visual memory, and low average range for visual recognition. A.R. 609-610. His executive functioning was average and visual-spatial abilities were impaired. A.R. 610.

In personality functioning testing, Cropsey scored in the low range for anxiety and endorsed difficulty with relaxation, fears, and trembling hands. His profile indicates that he likely develops physical symptoms in response to stress, including feelings of fatigue, sexual

dysfunction, sleep disturbance, and preoccupation with poor health. It further suggests that he has unusual thought processes that may result in somatic delusions. A.R. 610-611.

Dr. Dempsey diagnosed major neurocognitive disorder due to multiple etiologies (traumatic brain injury and substance abuse) with behavioral disturbance; severe stimulant use disorder in reported sustained remission; stimulant induced anxiety disorder; and other unspecified psychotic disorder. A.R. 611. She opined that it was likely that Cropsey's social dysfunction and early school difficulties were caused by his head injury, while more recent mood instability "is due to substances." A.R. 612. According to Dr. Dempsey, "Mr. Cropsey would qualify for Social Security Income." A.R. 612.

### d. Katherine Wiebe, Ph.D.

Katherine Wiebe, Ph.D., performed a psychological evaluation of Cropsey on January 6, 2017. A.R. 729-744. Dr. Wiebe interviewed Cropsey, reviewed Dr. Dempsey's assessment and other records, performed a mental status exam, and administered testing.

Cropsey presented with problems with anxiety, cognitive problems, and being easily fatigued. A.R. 730. He reported taking Lorazepam, Risperdal, and Paxil. A.R. 731. He was casually dressed with disheveled hair and unkempt beard and mustache. He appeared underweight and older than his stated age. Cropsey was cooperative and responsive, with a depressed mood and flat affect. He evinced psychomotor slowing, delayed responding, and slowed processing speed. He was oriented to person, place, and time, and evinced problems with insight, judgment, and reasoning associated with his cognitive and personality disorder problems. A.R. 732.

Dr. Wiebe observed that Cropsey's problems with mood, anxiety, memory, attention, and somatic symptoms, and impairments in insight, judgment, and reasoning affect his abilities to make sound decisions and manage his personal affairs. A.R. 732.

Dr. Wiebe estimated Cropsey's premorbid IQ to be in the average range. He was severely impaired in attention and concentration; moderately to severely impaired in executive functioning, and moderately impaired with memory. A.R. 733. Cropsey's language was mildly to moderately impaired. He was mildly impaired in visual/spatial abilities and sensory/motor abilities. A.R. 734.

Dr. Wiebe diagnosed Cropsey with major depression, recurrent and severe, and generalized anxiety disorder. According to Dr. Wiebe, it is likely that Cropsey has long-term, chronic personality disorder characteristics including unspecified personality disorder traits, dependent personality traits, and avoidant personality features. A.R. 739.

Dr. Wiebe opined that Cropsey is markedly impaired in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for two-hour segments; perform at a consistent pace without an unreasonable number and length of rest periods; get along and work with others; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting and deal with normal work stressors; complete a normal workday and workweek without interruptions from psychologically based symptoms; and maintain regular attendance and be punctual. A.R. 744.

### 3. Treating Therapist

On October 10, 2016, Gardner Fair, M.F.T., wrote an assessment of Cropsey. A.R. 680-681. According to MFT Fair, Cropsey had been attending weekly psychotherapy sessions since May 20, 2016 to treat his generalized anxiety disorder. MFT Fair stated that the testing performed by Dr. Dempsey supported his working hypothesis that Cropsey's "anxiety is profound and structural, not simply a situational adjustment." A.R. 680. MFT Fair further opined that Cropsey's "chronic disability, his brain damage, . . . seem[s] to be at the root of his anxiety." A.R. 680. According to MFT Fair, Cropsey "has patches of very intelligent comments and a good vocabulary and memory, but . . . there appear more and more hints of something like confabulation as run across with dementia." A.R. 681.

## IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the

record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. ISSUES PRESENTED

Cropsey challenges the ALJ's decision on several grounds. He argues that the ALJ erred 1) in evaluating the medical opinions; 2) in assessing Cropsey's credibility; 3) in applying a standard of "total disability"; and 4) in determining that Cropsey could perform other work in the national economy. He also argues that the Appeals Council erred in failing to review the ALJ's decision upon submission of new and material evidence.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI. DISCUSSION

### A. Evaluation of the Medical Evidence

Cropsey argues that the ALJ erred with respect to weighing the medical opinion evidence.

#### 1. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither

examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific

12

evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

Cropsey argues that the ALJ erred in assigning only "partial weight" to the opinions of examining physicians Drs. Wiebe, Dempsey, and Kahn in favor of the opinions of reviewing physicians Drs. Peterson and Econome, who opined that despite limitations, Cropsey "remains capable of completing simple & complex tasks in a timely manner." The court notes that the ALJ did not actually address the report by Drs. Kahn and Medvinsky in the opinion. The court will first address the ALJ's treatment of the opinions of Drs. Weibe and Dempsey and then turn to the Kahn/Medvinsky report.

Cropsey asserts that the opinions of Drs. Peterson and Econome "are contradicted by all other evidence in the record, which shows that Plaintiff has substantial mental impairments." Mot. 10. Therefore, according to Cropsey, as "[t]here is no legitimate opinion evidence in the record that contradicts the opinions of" Drs. Wiebe and Dempsey, the ALJ was required to provide "clear and convincing" reasons to discount them.

Cropsey provides no further explanation of his position. He does not mention or address any of the reasons the ALJ provided to give partial weight to the opinions of Drs. Wiebe and Dempsey and does not discuss the opinions of Drs. Peterson and Econome at all. It is not enough for Cropsey to describe the opinions of Drs. Peterson and Econome as not "legitimate." To be sure, a non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining physician. *Pitzer*, 908 F.2d at 506 n.4. However, the ALJ did not assign partial weight to the Wiebe and Dempsey opinions solely in reliance on the Peterson and Econome opinions. Rather, the ALJ discussed the Wiebe and Dempsey opinions and accorded them partial weight, noting that both were "not consistent with the record as a whole, which shows the claimant's mental impairments are largely stable with medication management." A.R. 40-41. As to Dr. Dempsey, the ALJ also stated that her opinion "is further not supported with an explanation in support of the findings." A.R. 41. Given the contradictions between the Wiebe/Dempsey opinions and the Peterson/Econome opinions, the ALJ was required to provide

13

"specific and legitimate reasons" supported by substantial evidence to discount the Wiebe/Dempsey opinions. As noted, Cropsey does not address the reasons the ALJ offered in his motion, and the court concludes that Cropsey has not shown error with respect to these opinions.

As to the Kahn/Medvinsky report, Cropsey does not address the ALJ's failure to discuss the report in his opinion. For her part, the Commissioner does not mention the report at all in her opposition. The court concludes that any error by the ALJ as to the report was harmless. While the report was detailed and thorough, the stated goal of the report was "aimed at learning whether or not [Cropsey] had a diagnosable intellectual disability and if there were emotional and/or psychological issues that were impacting his functioning." A.R. 511. While one of the report's recommendations is "[i]ncrease time limits to complete tasks as [Cropsey] appears to have a slower processing speed," A.R. 521, the report does not otherwise address Cropsey's capacity for work. Accordingly, any error by the ALJ was harmless as it is "inconsequential to the ultimate nondisability determination." *Tommasetti*, 533 F.3d at 1038 (quotation omitted).

### B. Credibility Assessment

Cropsey next argues that the ALJ erred in assessing his credibility.

#### 1. Legal Standard

In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted). An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)). However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id*. at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

14

claimant's testimony."). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted). Absent affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The Ninth Circuit has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's decision to reject a claimant's testimony. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014).

### 2. Analysis

The ALJ found that Cropsey's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Cropsey's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." A.R. 42. As there was no evidence that Cropsey was malingering, the ALJ was required to provide "specific, clear and convincing" reasons for rejecting his testimony.

Cropsey asserts that the ALJ's credibility assessment failed to meet this standard, suggesting that the sole basis for the assessment was the statement above. However, he does not

address the ALJ's more detailed discussion of his credibility:

> The objective medical findings reveal some limitations, but not to the extent alleged by the claimant. Considering the longitudinal record, the evidence shows that the claimant has the capacity to do unskilled work. Although, the claimant voluntarily quit his most recent job due to being overwhelmed by the job responsibilities, the claimant is still able to perform the past relevant jot of a dishwasher given his limitations. The claimant had no on the job issues that support an inability to do unskilled work. . . . The medical source statement of the record indicates that the claimant has at most moderate[ ] limitations mentally. The first record of severe limitations is at Exhibit 11F/5 on January 6, 2017, where the psychologist concludes that overall the claimant has "severe" impairments in attention and concentration. The claimant lives alone and is able to perform activities of daily living on his own. His IQ is within average range. The claimant takes multiple medications (Exhibit 12F/4), which indicates that he has severe impairments. However, at this point, with the current record, disability is not warranted.

A.R. 42.

Cropsey does not challenge any of these reasons as not satisfying the "specific, clear and convincing standard"; in fact, he does not acknowledge any of these reasons in his motion. The court concludes that the ALJ did not err because he provided specific, clear and convincing reasons for discounting Cropsey's testimony.

### C. Step Five Determination

Cropsey next asserts that the ALJ erred in determining that he could perform other work at step five. His argument is as follows: "The ALJ explicitly determined that Plaintiff retained the functional capacity at Step Five to perform only 'simple routine tasks,' which constitutes a substantial non-exertional limitation precluding application of the Grids under *Holohan*, *Hoopai*, and *Desrosiers*." Mot. 11 (citing A.R. 26). The basis for this argument is unclear, as the ALJ did not rely on the Medical-Vocational Guidelines to determine that Cropsey could perform work existing in the national economy. *See* A.R. 44. The portion of the record cited by Cropsey in his motion, A.R. 26, is a fax cover sheet from Cropsey's attorney. The court finds no error on this point.

### D. Submission of New Evidence to the Appeals Council

Finally, Cropsey argues that the Appeals Council erred in failing to review the ALJ's decision upon submission of new evidence. He states that he submitted "new and material

16

evidence" to the Appeals Council in January 2018. *See* A.R. 2. This evidence included a "Critical/Dire Need request, from Gardner Fair, M.F.T. dated January 2, 2018" and "Attorney-Representative Submitted Evidence from Jean Marsters, M.D. dated January 16, 2018." A.R. 2, 20-21. Cropsey asserts that the evidence were medical opinions by his treating mental health providers, and "[b]oth providers noted that their opinions were based on the full extent of their treating relationship" with him. Mot. 12. In Dr. Marsters's Mental Impairment Questionnaire, she indicated that she had treated Cropsey "every few weeks to 2 months" since March 27, 2017. A.R. 20-25. In MFT Fair's assessment, he wrote that Cropsey had seen him for psychotherapy two or three times per month since May 20, 2016. A.R. 27-29.

In its decision, the Appeals Council wrote, "[t]he Administrative Law Judge decided your case through November 24, 2017. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before November 24, 2017." A.R. 2.

Social Security regulations "permit claimants to submit new and material evidence to the Appeals Council and require the Council to consider that evidence in determining whether to review the ALJ's decision, so long as the evidence relates to the period on or before the ALJ's decision." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).[2] The Ninth Circuit "has specifically held that medical evaluations made after the expiration of a

---

[2] The applicable provision states in relevant part:

> If you submit additional evidence that does not relate to the period on or before the date of the administrative law judge hearing decision as required in paragraph (a)(5) of this section . . . the Appeals Council will send you a notice that explains why it did not accept the additional evidence and advises you of your right to file a new application. The notice will also advise you that if you file a new application within 6 months after the date of the Appeals Council's notice, your request for review will constitute a written statement indicating an intent to claim benefits under § 404.630. If you file a new application within 6 months of the Appeals Council's notice, we will use the date you requested Appeals Council review as the filing date for your new application.

20 C.F.R. § 404.970(c).

claimant's insured status are relevant to an evaluation of the preexpiration condition." *Taylor v. Comm'r of Soc. Sec. Admin*, 659 F.3d 1228, 1232 (9th Cir. 2011) (quoting *Lester*, 81 F.3d at 832); *see Mancillas v. Colvin*, No. 5:13-cv-02522-PSG, 2014 WL 2918897, at *3-4 (N.D. Cal. June 26, 2014) (holding that Appeals Council erred by refusing to consider RFC assessment by therapist and psychiatrist that post-dated ALJ decision but was based on treatment rendered prior to the ALJ decision). Here, the evidence by Dr. Marsters and MFT Fair relate to treatment given before the ALJ's November 24, 2017 decision because each provider states that they treated Cropsey for 11 months and nearly two years, respectively. A.R. 20, 27. Therefore, the opinions are from the "period on or before the ALJ's decision." Accordingly, the court remands for consideration of these two opinions. *See Taylor*, 659 F.3d at 1233 ("Where the Appeals Council was required to consider additional evidence, but failed to do so, remand to the ALJ is appropriate so that the ALJ can reconsider its decision in light of the additional evidence.").[3]

## VII. CONCLUSION

For the foregoing reasons, the court grants in part Cropsey's motion for summary judgment and remands this matter for proceedings consistent with the opinion.

**IT IS SO ORDERED.**

Dated: September 23, 2019



Donna M. Ryu
United States Magistrate Judge

---

[3] The court notes that Cropsey also argues that "The ALJ erred in holding Plaintiff to a standard of 'total disability.'" Mot. 11. As with much of his motion, Cropsey does not explain this argument in any detail or provide any authority supporting his position. He also provides no citation to the ALJ's opinion for this point. The court declines to consider this unbriefed, undeveloped argument.

18